Merie B. on behalf of Brayden O., appellant, v.
State of Nebraska Department of Health and
Human Services and Vivianne M. Chaumont,
director of Division of Medicaid and Long
Term Care, Department of Health
and Human Services, appellees.

___ N.W.2d ___

Filed May 22, 2015.   No. S-14-007.

1. **Administrative Law: Judgments: Appeal and Error.** A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record.
2. ____: ____: ____. When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.
3. **Administrative Law: Statutes.** Properly adopted and filed agency regulations have the effect of statutory law.
4. **Judgments: Statutes: Appeal and Error.** When an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent, correct conclusion irrespective of the determination made by the court below.
5. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.
6. ____: ____. An appellate court will try to avoid, if possible, a statutory construction that would lead to an absurd result.
7. **Administrative Law: Judicial Notice.** Every court of this state may take judicial notice of any rule or regulation that is signed by the Governor and filed with the Secretary of State.

Appeal from the District Court for Lancaster County: Stephanie F. Stacy, Judge. Reversed and remanded with directions.

Terrance A. Poppe and Benjamin D. Kramer, of Morrow, Poppe, Watermeier & Lonowski, P.C., L.L.O., for appellant.

Jon Bruning, Attorney General, and Michael J. Rumbaugh for appellees.

Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Wright, J.

# I. NATURE OF CASE

Merie B. filed this action on behalf of her daughter, Brayden O., who suffers from Coffin-Lowry Syndrome. Brayden is a minor child, and she had been receiving home and community-based waiver services for approximately 12 years at the time this case began. On November 1, 2012, the Nebraska Department of Health and Human Services (DHHS) reassessed her condition. DHHS determined that she no longer qualified for waiver services and subsequently terminated the services.

Following an appeal hearing, DHHS upheld the discontinuance of services to Brayden. On appeal from DHHS' decision, the Lancaster County District Court affirmed. This case comes to us as an appeal from the judgment entered by the district court.

For the reasons discussed below, we reverse the judgment of the district court and remand the cause with directions.

# II. SCOPE OF REVIEW

[1,2] A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record.[1] When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[2]

# III. FACTS

Brayden suffers from Coffin-Lowry Syndrome, which is generally characterized by craniofacial abnormalities, skeletal abnormalities, short stature, and hypotonia (a condition causing low muscle tone and reduced strength). She has also developed

---

[1] *Nebraska Account. & Disclosure Comm. v. Skinner*, 288 Neb. 804, 853 N.W.2d 1 (2014).

[2] *Id.*

moderate kyphosis (a curving of the spine) and problems with her feet. She lacks pain awareness and suffers from a seizure disorder. Brayden's mother, Merie, is a registered nurse at a neurological and spinal surgery clinic. She described Coffin-Lowry Syndrome as follows:

> It's extremely rare. It is an X-linked dominant chromosomal abnormality. [Brayden] was born with [a]genesis [failure to develop during embryonic growth] of her brain. She has less than 10 percent of her corpus callosum, which in essence is the wiring between the two hemispheres [of the brain] that makes the connection.

As a registered nurse, Merie is able to provide service in her home in a way that non-health-care professionals would be unable. Merie has difficulty both working and personally providing care for Brayden without waiver services. At the time of trial, Merie's husband had been stationed in Afghanistan for 1 year and was unable to assist Merie in caring for Brayden.

Brayden's disability affects her in many ways. She has a history of seizures and requires 24-hour supervision. She was taking Phenobarbital and Dystat to control the seizures. Merie stated that if she were not trained as a nurse, Brayden would constantly be in the doctor's office for treatment. Merie ensures that Brayden takes her medication.

Brayden has a high palate, which necessitates that she be monitored for choking when she eats. She requires assistance at all times in bathing, dressing, and grooming. She is dependent on others and needs constant supervision in all parts of toileting. There is evidence that she has lost bowel and bladder control. She has extremely limited cognitive ability. She requires a hearing aid and has difficulty seeing a level of print.

At school and on the bus to and from school, Brayden requires constant supervision and has a one-on-one paraprofessional to assist her at all times. Brayden has no sense of danger or safety. She needs assistance on the playground, uneven surfaces, stairs, and curbs. She is almost completely dependent on others in her ability to communicate. She "communicates inappropriate intent" and is not able to effectively use communication boards or other adaptive devices.

As to her behavior, Brayden needs and receives regular intervention in the form of redirection because she has episodes of disorientation. She does not have any sense of herself in relation to space and requires supervision with respect to orientation. As to judgment, she lacks the ability to solve problems and make appropriate decisions. She can find the letter "G" on a keyboard but has difficulty finding other letters. She can identify the numbers 1 through 5 with 80-percent accuracy but cannot identify numbers 6 through 10, nor is she accurate in counting certain sets of items (e.g., two newspapers, three markers, et cetera).

As a result of her disabilities, Brayden has received home and community-based waiver services since 2001. Home and community-based waiver services offer eligible persons who meet the "Nursing Facility" (NF) level of care the choice between entering a nursing home facility or receiving supportive services in their homes.[3] The benefits under the waiver program are intended for children that are at a nursing home level of care. The parents' income is waived, and services are then provided at a capped amount, regardless of the parents' income. Each child receiving services is assigned a services coordinator who gathers necessary information to submit to DHHS' pediatric nurse consultant for the waiver program in order to make a level of care eligibility determination.

On or about November 1, 2012, DHHS reassessed Brayden's continuing eligibility for services. It notified her that home and community-based waiver services would be discontinued, effective November 11, because she failed to meet the specific eligibility criteria. It was determined that Brayden did not have a medical treatment need, nor was she eligible based on her "Activities of Daily Living and other Considerations. Manual Reference 480 NAC 5-002 C1(1f)[sic]."[4] (The regulation cited by DHHS in its notification of termination of waiver services

---

[3] 480 Neb. Admin. Code, ch. 5, § 001.A (1998).

[4] See 480 Neb. Admin. Code, ch. 5, § 003.C1 (1998). ("[e]ligibility for services under the waiver may be denied or terminated for any of the following reasons: . . . f. The client fails to meet the specified eligibility criteria").

does not exist; we believe DHHS intended to cite to 480 Neb. Admin. Code, ch. 5, § 003.C1f, because of later references to that section.)

Notwithstanding DHHS' discontinuance of her waiver services, the only change in Brayden's condition was that her seizures were determined to be controlled with medication. Brayden was found to be independent in the areas of mobility, transferring, hearing, and vision. She remained dependent in all other criteria in the categories considered by DHHS.

Merie appealed DHHS' evaluation and termination of waiver services. Following a hearing, DHHS affirmed the termination of services for Brayden. Merie then appealed to the district court, contending that DHHS used the wrong criteria to evaluate Brayden's eligibility and that DHHS erred in finding that she did not meet the NF level of care criteria for waiver services.

Merie claimed that DHHS incorrectly relied upon title 480, chapter 5, § 3B (1998) (480 NAC 5-003.B), of the Nebraska Administrative Code and that title 471, chapter 12 (1999) (471 NAC 12-000), contained the appropriate criteria for NF level of care eligibility. She asserted that DHHS' assessment instrument—Form MILTC-13AD, Home and Community-Based Waiver Child/Client's Level of Care Document (exhibit 4)—did not integrate all the relevant criteria. It is not disputed that exhibit 4 was the document DHHS used in its assessment of eligibility for children.

The district court found that the only contested issue was whether Brayden met the NF level of care criteria. The court accepted DHHS' use of title 480, chapter 5, § 3B3b (480 NAC 5-003.B3b) to create exhibit 4 and found this was the regulation that provided the correct criteria. It concluded that the regulations provided for two distinct waiver services—children with disabilities and adults with disabilities—and that 480 NAC 5-003.B3b served as the basis for exhibit 4.

The court noted that while the NF level of care criteria in 471 NAC 12-000 were incorporated by reference into title 480,[5] they were incorporated as only one part of the criteria

---

[5] See 480 Neb. Admin. Code, ch. 5, § 002 (1998).

for waiver services. It therefore rejected Merie's claim that 471 NAC 12-000 provided the appropriate regulations for determining the NF level of care to waiver services eligibility. It accepted DHHS' creation and use of exhibit 4 as the appropriate method of evaluating a child's NF level of care for waiver services. Based upon exhibit 4, the court concluded that Brayden did not satisfy the NF level of care requirement for waiver services and affirmed the termination of those services. Merie timely appealed.

## IV. ASSIGNMENTS OF ERROR

Merie assigns that the district court erred in finding that she did not meet the NF level of care criteria for waiver services and that the district court erred in not using the NF level of care criteria in chapter 12 of title 471.

## V. ANALYSIS

### 1. Relevant Regulations

#### (a) Issue

We are presented with a question of law, which we decide independent of the lower court's determination. The issue is whether DHHS used the correct NF level of care criteria for waiver services to evaluate Brayden. To resolve this issue, we must examine the regulations that describe the criteria for waiver services. Merie claims that DHHS and the district court should have considered the NF level of care criteria found in 471 NAC 12-000. DHHS claims that 480 NAC 5-003.B3b is the regulation that provides the appropriate criteria. We therefore look to these provisions of the Nebraska Administrative Code for resolution.

[3-6] Properly adopted and filed agency regulations have the effect of statutory law.[6] When an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent, correct conclusion irrespective of the determination made by the court below.[7] Statutory language

---

[6] See *Middle Niobrara NRD v. Department of Nat. Resources*, 281 Neb. 634, 799 N.W.2d 305 (2011).

[7] *Hooper v. Freedom Fin. Group*, 280 Neb. 111, 784 N.W.2d 437 (2010).

is to be given its plain and ordinary meaning, and we will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[8] An appellate court will try to avoid, if possible, a statutory construction that would lead to an absurd result.[9]

[7] We take judicial notice, as did the district court, of 471 NAC 12-000 and title 480, chapter 5 (1998) (480 NAC 5-000), of the Nebraska Administrative Code. Every court of this state may take judicial notice of any rule or regulation that is signed by the Governor and filed with the Secretary of State.[10]

### (b) Home and Community-Based Waiver Services for Aged Persons, Adults, or Children (480 NAC 5-000)

The criteria for waiver services eligibility are described in 480 NAC 5-000. To be eligible for support through the "Aged and Disabled Waiver" program, a potential client must meet three general requirements: "1. Have care needs equal to those of Medicaid-funded residents in Nursing Facilities; 2. Be eligible for Medicaid; and 3. Work with the services coordinator to develop an outcome-based, cost effective service plan."[11]

Certain definitions are relevant to our analysis. An adult—for purposes of Medicaid and this waiver—is an individual age 18 or older.[12] An aged person is an individual age 65 or older.[13] A child is an individual age 17 or younger.[14] Age is the only distinction among the three descriptions of clients under this section. "Plan of Services and Supports" is a process for providing services and supports that takes into consideration

---

[8] *Watkins v. Watkins*, 285 Neb. 693, 829 N.W.2d 643 (2013).

[9] See *In re Interest of Nedhal A.*, 289 Neb. 711, 856 N.W.2d 565 (2014).

[10] Neb. Rev. Stat. § 84-906.05 (Reissue 2014).

[11] 480 Neb. Admin. Code, ch. 5, § 001.A.

[12] See *id.*, § 001.E.

[13] *Id.*

[14] *Id.*

each client's strengths, needs, priorities, and resources resulting in an individualized, written plan for each client.[15] "Waiver" is defined as "Nebraska's Home and Community-Based Waiver for Aged Persons or Adults and Children with Disabilities."[16]

The regulations describe the specific "Client Eligibility Criteria" for home and community-based waiver services. Clients must meet five specific requirements to be eligible for waiver services:

> Clients eligible for waiver services must -
>
> 1. Be eligible for the Nebraska Medicaid Assistance Program (NMAP);
>
> 2. Have participated in an assessment with a services coordinator;
>
> 3. *Meet the Nursing Facility (NF) level of care criteria (471 NAC 12-000)*;
>
> 4. Have care needs which could be met through waiver services at a cost that does not exceed the cap; and
>
> 5. Have received an explanation of NF services and waiver services and elected to receive waiver services.[17]

These regulations are not ambiguous, and they do not distinguish among clients who are aged persons, adults, or children, and therefore, *all* clients must presumably meet the requirements. In its waiver services assessment and termination notice, DHHS repeatedly referred to Brayden as a "client." Section 5-002 requires clients to meet the NF level of care criteria in 471 NAC 12-000 to be eligible for waiver services.[18] "Home and Community-Based Waiver Services" refer to "Aged Persons or Adults or Children with Disabilities."[19] As a result, the third requirement—meeting the NF level of care in 471 NAC 12-000—describes the NF level of care criteria under which all clients must be assessed. We therefore turn to 471 NAC 12-000.

---

[15] *Id*.

[16] *Id*.

[17] *Id*., § 002 (emphasis supplied).

[18] *Id*.

[19] 471 Neb. Admin. Code, ch. 12, § 001.04.

### (c) NF Level of Care for "Persons"
### or "Clients" (471 NAC 12-000)

The regulations governing NF services are contained in 471 NAC 12-000. To be eligible for waiver services, a client must meet the NF level of care criteria in 471 NAC 12-000, which are specifically set forth therein. No differentiation except age exists among children, adults, and aged persons in 471 NAC 12-000.[20] Within the definition of terms in 471 NAC 12-000, "Home and Community-Based Waiver Services for Aged Persons or Adults or Children with Disabilities" is defined as an array of community-based services available to individuals who are eligible for NF services under Medicaid but choose to receive services at home.[21] Children are specifically referenced under this definition of "Home and Community-Based Waiver Services."[22] The purpose of the waiver services is to offer options to Medicaid clients who would otherwise require NF services.[23]

Each client is to be evaluated based upon the NF level of care criteria in title 471, chapter 12, § 003.02, of the Nebraska Administrative Code (471 NAC 12-003.02). That section requires DHHS to apply the criteria therein to determine the appropriateness of services on admission and at each subsequent review.[24] Services coordinators (DHHS staff or contractors) are required to collect information from four assessment categories: (1) activities of daily living (ADL), (2) risk factors, (3) medical treatment or observation, and (4) cognition.[25] A description of those categories is warranted.

The first client assessment category in title 471 is the ADL category, which includes seven ADL's: (a) bathing, (b) continence, (c) dressing/grooming, (d) eating, (e) mobility,

---

[20] See *id.*, § 003.02(1) through (4) (referring only to "client" classification for NF level of care).

[21] *Id.*, § 001.04.

[22] See *id.*

[23] *Id.*

[24] *Id.*, § 003.02.

[25] See *id.*

(f) toileting, and (g) transferring (i.e., ability to move from one place to another, including bed to chair and back, and into and out of a vehicle).[26]

The second category, "Risk Factors," includes three areas:

a. Behavior: The ability to act on one's own behalf, including the interest or motivation to eat, take medications, care for one's self, safeguard personal safety, participate in social situations, and relate to others in a socially-appropriate manner.

b. Frailty: The ability to function independently without the presence of a support person, including good judgment about abilities and combinations of health factors to safeguard well-being and avoid inappropriate safety risk.

c. Safety: The availability of adequate housing, including the need for home modification or adaptive equipment to assure safety and accessibility; the existence of a formal and/or informal support system; and/or freedom from abuse or neglect.[27]

The third assessment category is "Medical Treatment or Observation." A client can satisfy this category in three ways:

a. A medical condition is present which requires observation and assessment to assure evaluation of the individual's need for treatment modification or additional medical procedures to prevent destabilization and the person has demonstrated an inability to self-observe and/or evaluate the need to contact skilled medical professionals; or

b. Due to the complexity created by multiple, interrelated medical conditions, the potential for the individual's medical instability is high or exists; or

c. The individual requires at least one ongoing medical/nursing service.[28]

---

[26] *Id.*

[27] See *id.*

[28] *Id.*

This category provides a noninclusive list of 23 such medical/nursing services which may, but do not necessarily, indicate a need for medical or nursing supervision or care.

The fourth category, "Cognition," includes four areas: (a) memory, (b) orientation, (c) communication, and (d) judgment.[29]

Once the assessment of the criteria in the four described categories has been completed, DHHS can proceed to determine the NF level of care for waiver services based upon the information collected. Each client is to be evaluated based upon the prescribed number of limitations in each category. Title 471 describes the number of limitations required in each category for the NF level of care eligibility.[30] Services coordinators collect the information on the four criteria categories on "each individual" seeking NF or waiver services to determine the functional abilities and care needs of that individual.[31]

Persons who require assistance, supervision, or care in at least one of the following four categories meet the level of care criteria for waiver services:

    1. Limitations in three or more [ADL's] AND Medical treatment or observation.

    2. Limitations in three or more ADLs AND one or more Risk factors.

    3. Limitations in three or more ADLs AND one or more Cognition factors.

    4. Limitations in one or more ADLs AND one or more Cognition AND one or more Risk factors.[32]

Thus, 471 NAC 12-000 clearly describes the number of limitations in each category that a client must have in order to be eligible for waiver services. Using these four assessment categories, the client's limitations in each category are evaluated to determine whether the client has met the required number of limitations for waiver service eligibility.

---

[29] *Id.*

[30] *Id.*, § 003.02A.

[31] *Id.*

[32] *Id.*

### (d) Children With Disabilities
### (480 NAC 5-003.B)

The district court concluded that 480 NAC 5-003.B, rather than 471 NAC 12-000, provided the basis for DHHS' evaluation of children seeking waiver services. It found that DHHS adopted a specific regulation—480 NAC 5-003.B3b—to assess Brayden's level of care and used this regulation to create exhibit 4.

But 480 NAC 5-003.B pertains to disabled children seeking waiver services and describes how children and their families access home and community-based services through DHHS. The purpose of 480 NAC 5-003.B mirrors the purpose of title 480, chapter 5, § 003.A, of the Nebraska Administrative Code which pertains to disabled adults. That purpose is "[t]o allow easy entry into the health and human services system for children with disabilities and their families who are in need of services."[33]

Each child is evaluated by a services coordinator, and based upon intake/screening, the services coordinator determines the child's priority ranking.[34] If the potential waiver eligible child does not meet priority criteria, the services coordinator informs the referral source and provides notice to the child's guardian, if such contact has been made.[35] If the child is eligible to be assessed for waiver services, an assessment visit is scheduled.[36]

The purpose of the information gathered by the services coordinator at the assessment is "[t]o identify the potential waiver eligible child's and family's strengths, needs, priorities, and resources so an appropriate plan of services and supports can be developed."[37] The services coordinator meets in person with the child and his or her guardian to complete an

---

[33] 480 Neb. Admin. Code, ch. 5, § 003.B1. See 480 Neb. Admin. Code, ch. 5, § 003.A1.

[34] *Id.*

[35] 480 Neb. Admin. Code, ch. 5, § 003.B2c.

[36] *Id.*, § 003.B2d.

[37] *Id.*, § 003.B3.

assessment of the child's and family's strengths, needs, priorities, and resources.[38]

The services coordinator is required to gather functional information to determine a child's NF level of care eligibility that reflects the child's developmental level and includes information in the following six NF domains: (1) ADL, (2) cognition, (3) environment, (4) medical/health status, (5) support network, and (6) transition.[39]

DHHS used only two domains—ADL and medical/health status—to create its assessment document, exhibit 4. We summarize the six domains as follows:

(1) ADL, which includes:

(a) behavior—ability to exhibit actions that are developmentally and socially appropriate in the areas of independence, maturation, learning, and social responsibility;

(b) general hygiene—bathing, dressing, and grooming;

(c) feeding/eating;

(d) movement—(1) mobility: ability to move from place to place indoors or outside, and (2) transferring: ability to move from one place to another, including a bed to a chair and back, and into and out of a vehicle;

(e) sight;

(f) hearing;

(g) communication; and

(h) toileting.

(2) Cognition: The ability to remember, reason, understand, and use judgment.

(3) Environment: The ability to function in his or her living situation, including health, housing, and accessibility.

(4) Medical/health status: Any medical or health condition that impacts the child's ability to function independently.

(5) Support network: The ability and capacity of extended family, friends, and community resources to provide informal and formal supports.

---

[38] *Id.*, § 003.B3a.

[39] *Id.*, § 003.B3b.

(6) Transition: The availability of a coordinated set of activities designed to promote independence and movement through services and developmental stages.[40]

The services coordinators were to route this functional information gathered during the in-person assessment and other documentation to DHHS' central office for an NF level of care determination.[41] Following an evaluation, if the child did not meet the NF level of care, the services coordinator was to provide written notice of this decision to the child's guardian.[42]

But unlike title 471, chapter 12, § 003.02A, of the Nebraska Administrative Code (471 NAC 12-003.02A), neither 480 NAC 5-003.B3b nor any other portion of section B provides a specific description of which assessment categories or the number of limitations required in each category that are required to meet the NF level of care for eligibility. However, section B provides that the services coordinator shall: "Together with the child and family, further develop the plan of services and supports. This is accomplished by identifying desired client outcomes. Outcomes should occur in one or more of the following NF domains: [ADL]; cognition; environment; medical/nursing status; support network; and transition."[43]

A child is reassessed when he or she reaches the age of 18, using the criteria provided in 471 NAC 12-003.02, and if the child remains at the NF level of care, a new plan of services and supports must be completed.[44]

(e) Findings Regarding NF Level
of Care Criteria for Children
With Disabilities

We conclude that 480 NAC 5-003.B does not alter the criteria for the NF level of care described in 471 NAC 12-000,

---

[40] See *id*.

[41] *Id*., § 003.B3c.

[42] *Id*.

[43] *Id*., § 003.B4a.

[44] *Id*., § 003.B7f.

which is required of all clients to be eligible for waiver services.[45] Moreover, 480 NAC 5-000.B does not alter the NF level of care criteria and requirements provided in 471 NAC 12-000 as they relate to disabled children. We reach this conclusion for several reasons.

First, title 480 of the Nebraska Administrative Code requires that *all clients*—aged persons, adults, and children—eligible for waiver services must meet the NF level of care criteria in 471 NAC 12-000.[46] We find no ambiguity or limitation as to the plain meaning of this requirement. Statutory language is to be given its plain and ordinary meaning.[47]

Second, we note that the purposes stated in the relevant sections of 471 NAC 12-000 and 480 NAC 5-003.B have important differences. The purpose of the criteria and assessment categories described in 471 NAC 12-000 is to determine the appropriateness of services on admission and at each subsequent review.[48] Services coordinators collect the information in the listed criteria for *each individual*—children, adults, and aged persons—seeking NF or waiver services to determine the functional abilities and care needs of that individual.[49] Each of the assessment categories are evaluated according to the limitations required in each category as provided in 471 NAC 12-003.02. "*Persons* who require assistance, supervision, or care in at least one of the [four assessment] categories *meet the level of care criteria for* [*NF*] *or Aged and Disabled Home and Community-based Waiver services*."[50] As previously noted, the number of limitations in each category is expressly described in the regulations. The plain language of the purpose of 471 NAC 12-000 indicates that it was intended to provide the NF level of care criteria for waiver services for all persons. Moreover, 471 NAC 12-000 identifies its application to

---

[45] See *id.*, § 002.

[46] See *id.*

[47] *Watkins v. Watkins, supra* note 8.

[48] 471 Neb. Admin. Code, ch. 12, § 003.02.

[49] *Id.*, § 003.02A.

[50] *Id.* (emphasis supplied).

children in its definition of home and community-based waiver services for aged persons, adults, and children.[51]

In contrast, the purpose of 480 NAC 5-003.B3b is "[t]o identify the potential waiver eligible child's and family's strengths, needs, priorities, and resources *so an appropriate plan of services and supports can be developed*."[52] This purpose is separate and distinct from the determination whether the person met the NF level of care. Thus, if a child qualified for waiver services under 471 NAC 12-000, the services coordinator was to further develop the plan of services and supports.[53] This was accomplished by identifying desired client outcomes.[54]

The services coordinator then "[routes] functional information gathered during the in-person assessment and other documentation to [DHHS] Central Office for a NF level of care determination."[55] The functional information—along with "other documentation"—is then used in making a level of care assessment. However, 480 NAC 5-003.B does not change the NF level of care criteria described in 471 NAC 12-000.

Third, 471 NAC 12-000 methodically describes four categories of criteria and the number of limitations within each category that are required to meet the NF level of care.[56] In contrast, 480 NAC 5-003.B provides no such assessment categories or required number of limitations. It does not state what categories are to be used or the number of limitations required for such category. Therefore, 480 NAC 5-003.B provides no basis for an eligibility assessment, as it would permit an arbitrary creation of eligibility requirements. The lack of such guidance in 480 NAC 5-003.B leads us to conclude that it does not alter or supersede the assessment scheme in 471 NAC 12-000 for disabled children. We discuss this point in greater detail later in our analysis.

---

[51] *Id.*, § 001.04.

[52] 480 Neb. Admin. Code, ch. 5, § 003.B3 (emphasis supplied).

[53] *Id.*, §§ 003.B3b and 003.B4a.

[54] *Id.*, § 003.B4a.

[55] *Id.*, § 003.B3c.

[56] See 471 Neb. Admin. Code, ch. 12, §§ 003.02 and 003.02A.

We conclude that the correct NF level of care criteria to be applied to all persons—aged persons, adults, and children—are set forth in 471 NAC 12-000, which title 480 incorporates by express reference in chapter 5, § 002.

## 2. Exhibit 4

Because exhibit 4 was the assessment document used to evaluate children with disabilities, we discuss its use by DHHS. Instead of using the assessment categories and limitations provided in 471 NAC 12-000, DHHS created exhibit 4 as its document to assess the NF level of care for disabled children. The requirements in exhibit 4 differ significantly from those expressly provided in 471 NAC 12-000. Exhibit 4's assessment categories were created from two of the domains described above—medical treatment needs and selected ADL's. But the categories created in exhibit 4 were much more restrictive as applied to children. We discuss those categories and the requirements for each category.

Exhibit 4 contained three assessment categories. A disabled child had to satisfy the requirements of one of the three categories to be eligible. This is contrasted with the four categories described in 471 NAC 12-003.02A. The three categories in exhibit 4 used only two of the six domains described in 480 NAC 5-003.B3b: medical treatments/therapies and ADL. We find no explanation why DHHS used only these two domains as its assessment categories. DHHS did not explain why it failed to use or consider the remaining domains of cognition, environment, support network, and transition.

Under exhibit 4, disabled children were required to qualify in at least one of the three assessment categories. The three categories are set forth in detail:

(1) Medical treatments/therapies: This category had a list of nine possible medical treatments or therapies needed by a child so as to meet the NF level of care. The child had to require at least one of the nine treatments.

(2) ADL: This category incorporated seven ADL's described in 480 NAC 5-003.B3b(1)—dressing, grooming, bathing, eating, transfers, mobility, and toileting. The child was required to be dependent in six of seven areas in order to meet the

NF level of care under this category. There is no regulation that set forth the number of limitations required for this category.

(3) Other considerations: This category incorporated the remaining four ADL's in 480 NAC 5-003.B3b—behavior, communication, vision, and hearing. In order to qualify, the child was required to be dependent in three of four areas and also be dependent in four of the seven ADL areas in the second category. Similar to the second category, there is no regulation that set forth the number of limitations required for this category.

### (a) First Category: Medical Treatments/Therapies

We do not expound on exhibit 4's first category, "Medical Treatments/Therapies," because the factual questions pertaining to Brayden's medical treatments were resolved against her. Exhibit 4 prescribes nine areas of medical treatment or needs. Number eight, "Unstable medical condition," is the only area applicable to Brayden. She was found not to have an unstable condition, because her seizures had become more controlled with medication.

### (b) Second Category: ADL

When we compare the requirements of the second category, ADL, to the requirements described in 471 NAC 12-003.02, we find that the requirements in exhibit 4 are much more restrictive for children. Persons assessed under 471 NAC 12-003.02 were required to be dependent in one or three ADL's, depending on the client's limitations in other categories. See 471 NAC 12-003.02A. But exhibit 4 required disabled children to be dependent in six of seven.

The ADL's of dressing, grooming, bathing, eating, transfers, mobility, and toileting are described as criteria for all clients under 471 NAC 12-003.02. But exhibit 4 required a child to be dependent in six of seven of those ADL's and made eligibility impossible under the second category if the child was mobile (i.e., she could walk) and could transfer (i.e., get in and out of a chair, bed, or car). Therefore, despite having other profound

disabilities, Brayden—or any child who could walk and transfer—could not qualify under the second category.

### (c) Third Category: Other Considerations

Alternatively, children could meet the requirements in the third category only if they were dependent in three of four evaluative areas of behavior, communication, hearing, and vision. And to qualify under the third category, children were required to be dependent in at least four ADL's from the second category and three of four in this third category.

Thus, the third category excluded children who could see and hear. Therefore, it was impossible for a child who was able to see and hear to meet the requirements under the third category of exhibit 4.

The standards provided in 471 NAC 12-003.02 did not require persons to have the high number of limitations that exhibit 4 imposed upon children.

### 3. Summary of Findings Regarding Exhibit 4

#### (a) Exhibit 4 Did Not Use Proper Criteria or Number of Limitations

Merie claims DHHS should not have used exhibit 4 as its assessment instrument. We agree. Title 480 requires all "Clients"—aged persons, adults, and children—to meet the NF level of care criteria in 471 NAC 12-000.[57] Age was not an assessment criteria for waiver service eligibility.

Instead, DHHS used 480 NAC 5-003.B3 as a basis for its assessment criteria and the person's status as a child. But the purpose of 480 NAC 5-003.B3 was "[t]o identify the potential waiver eligible child's and family's strengths, needs, priorities, and resources *so an appropriate plan of services and supports can be developed*."[58] Clearly, the unambiguous purpose of 480 NAC 5-003.B3b was not to prescribe the

---

[57] 480 Neb. Admin. Code, ch. 5, § 002.

[58] *Id.*, § 003.B3 (emphasis supplied).

child's NF level of care criteria for eligibility. In contrast, the criteria in 471 NAC 12-000 were used "to determine the *appropriateness of services on admission* and at each subsequent review."[59]

DHHS' reliance on the domains in 480 NAC 5-003.B3b to create exhibit 4 was misplaced. Exhibit 4 did not incorporate the proper criteria or use the number of limitations required in each category as provided in 471 NAC 12-000. For example, exhibit 4 excluded two of the four assessment categories provided in 471 NAC 12-003.02—"Risk Factors" and "Cognition."

Equally important, exhibit 4 did not properly assess the number of limitations required for each category as set forth in 471 NAC 12-003.02A, which provided a clear and specific number of limitations required for eligibility.

Therefore, we conclude that exhibit 4 did not comply with title 480, chapter 5, § 002, of the Nebraska Administrative Code which required that clients eligible for waiver services must meet the NF level of care criteria in 471 NAC 12-000.

### (b) Exhibit 4 Was Created Arbitrarily

Even assuming arguendo that 480 NAC 5-003B3b was the proper regulation to assess NF level of care for disabled children, we find that exhibit 4 was created arbitrarily. DHHS has not shown, and we find no basis, why DHHS placed seven ADL's in the second category and four ADL's in the third category or required six limitations in the second category and three limitations in the third category.

DHHS arbitrarily excluded four of six domains provided under 480 NAC 5-003.B3b. DHHS has not explained why it excluded the domains of cognition, environment, support network, and transition. It did not use or consider whether Brayden had the ability to remember, reason, understand, and use judgment (cognition); it did not consider her ability to function in her living situation (environment); it did not consider her ability and the capacity of extended family, friends, and community resources to provide informal and formal

---

[59] 471 Neb. Admin. Code, ch. 12, § 003.02 (emphasis supplied).

supports (support network); it did not consider the availability of a coordinated set of activities designed to promote independence and movement through services and developmental stages (transition).[60] Instead, DHHS created two of the three categories using the ADL domain and then arbitrarily decided which ADL's would be placed in each category and how many limitations in these categories were required.

Even if 480 NAC 5-003.B3b was the basis for exhibit 4, nothing therein permitted DHHS to arbitrarily select which domains to either use or disregard for child evaluation. None of these domains were shown to be of greater importance than another. DHHS provided no explanation for why it created two of the three categories in exhibit 4 from the ADL domain and excluded the remaining four domains.

The exclusion of the domain of cognition from exhibit 4 is particularly egregious because it is listed in both 471 NAC 12-000 and 480 NAC 5-003.B. Under 471 NAC 12-000, cognition includes the areas of memory, orientation, communication, and judgment.[61] Under 480 NAC 5-003.B3b, it is defined as "[t]he ability to remember, reason, understand, and use judgment." Brayden was evaluated only for communication and was found to be dependent. But DHHS did not consider whether she could remember, reason, understand, or use judgment. The record indicates that she was also likely dependent in the other areas of cognition, but her cognition was not considered.

Even if these domains had been used, there is no regulation that prescribes how they were to be evaluated to determine eligibility. DHHS can point to no part of title 480, chapter 5, that states these are the categories and number of limitations to be considered. In the absence of such a regulation, we conclude that DHHS arbitrarily created the categories and greatly increased the number of limitations that disabled children must satisfy to qualify for waiver services.

In contrast, 471 NAC 12-003.02 sets forth what categories are to be used and the number of limitations in each category

---

[60] See 480 Neb. Admin. Code, ch. 5, § 003.B3b.

[61] 471 Neb. Admin. Code, ch. 12, § 003.02.

that are required by a client for eligibility. DHHS disregarded this framework, and as a result, exhibit 4 arbitrarily placed a far greater burden on disabled children than similarly situated disabled aged persons and adults. We find no basis for this discrimination.

### (c) By Placing Far Greater Burden
### on Disabled Children, Exhibit 4
### Produced Unreasonable Result

DHHS' creation of exhibit 4 made it more difficult for disabled children than disabled adults to meet eligibility requirements for waiver services. The obvious result was to severely restrict the number of children who qualified for waiver services. Children who had profound disabilities requiring constant supervision were not eligible for waiver services if they had no immediate medical treatment necessity and could walk, transfer, see, and hear. The exclusion of such profoundly disabled children was unreasonable. Because the district court based its decision on exhibit 4, this unreasonable result is imputed to the district court's order which affirmed DHHS' termination of Brayden's waiver services.

In its analysis, the district court rejected Merie's argument that title 471 was the proper regulation for assessment of eligibility, because it found such interpretation would be contrary to DHHS' purpose in enacting title 480. We disagree. The stated purpose of title 480 as applied to *both children and adults* was "to allow easy entry into the health and human services system."[62] But that purpose was greatly undermined by the use of exhibit 4.

The manner in which DHHS created the three categories in exhibit 4 would exclude many of the disabled children who applied for waiver services. By selectively placing mobility and transferring ADL's in the second category and requiring a child to be dependent in six of seven ADL's, any child who could walk and get into and out of a bed or car was excluded under the second category. By selectively placing vision and

---

[62] 480 Neb. Admin. Code, ch. 5, § 003.B1. See 480 Neb. Admin. Code, ch. 5, § 003.A1.

hearing in the third category, any child who could see and hear was excluded under the third category. Sight and hearing were not listed as criteria in 471 NAC 12-003.02 and, therefore, not used for evaluation of adults and aged persons.

DHHS and the district court concluded that Brayden failed to meet the NF level of care for waiver services. But it was not disputed that she had received waiver services for nearly 12 years prior to the revocation. There had been no substantial change in her physical condition except her seizures were presently better controlled by medication. She remained dependent in toileting, bathing, dressing, grooming, eating, behavior, and communication. Although DHHS did not assess cognition, communication is one of the four cognition "factors" listed in 471 NAC 12-003.02.[63] There is substantial evidence that Brayden is also dependent or has severe limitations in the three other cognition factors of memory, orientation, and judgment. The record established that she did not have the ability to function independently without the constant presence of a support person. She lacked judgment to safeguard her well-being. However, despite being profoundly disabled, Brayden was denied waiver services.

Adults were treated much differently. An adult with Brayden's disabilities and limitations would likely have met the NF level of care under three of the four areas of the evaluation criteria and framework provided in 471 NAC 12-003.02. Given the purpose to allow easy access into the system, it is unreasonable to place a much higher burden on disabled children seeking waiver services than disabled aged persons and adults. The use of exhibit 4 was unreasonable.

### 4. Brayden Met NF Level of Care Under 471 NAC 12-000

To be eligible for waiver services, title 480 requires all clients—aged persons, adults, and children—to meet the NF level of care criteria in "471 NAC 12-000."[64] This includes both the criteria in the four categories and the number of limitations

---

[63] See 480 Neb. Admin. Code, ch. 5, § 003.B3b(2).

[64] *Id.*, § 002.

provided in 471 NAC 12-003.02A. One such category provides that a person meets the NF level of care for waiver services if he or she has "[l]imitations in three or more ADLs AND one or more Cognition factors."[65]

Although neither DHHS nor the district court considered cognition in their evaluations of Brayden, she was found to be dependent in behavior, bathing, dressing, grooming, eating, toileting, and communication. Bathing, dressing/grooming, eating, and toileting are ADL's under 471 NAC 12-003.02. Communication is one of the four "factors" of cognition.[66] She was therefore dependent in at least three ADL's and one cognition factor. Consequently, DHHS should have found that Brayden met the NF level of care for waiver services.

## VI. CONCLUSION

For the reasons set forth herein, we conclude the decision of the district court, which affirmed the revocation of waiver services by DHHS, did not conform to the law. DHHS' creation and use of exhibit 4 to evaluate Brayden was arbitrary and produced an unreasonable result. We reverse the judgment of the district court, which affirmed DHHS' revocation of Brayden's waiver service benefits, and remand the cause with directions that the district court order DHHS to reinstate Brayden's waiver services effective November 11, 2012.

REVERSED AND REMANDED WITH DIRECTIONS.

HEAVICAN, C.J., participating on briefs.

---

[65] 471 Neb. Admin. Code, ch. 12, § 003.02A.

[66] See *id.*, § 003.02.